**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

David Kujawski, Civil No. 00-1151 (DWF/AJB)

Plaintiff,

v. **MEMORANDUM OPINION AND ORDER**

U.S. Filter Wastewater Group, Inc.,

Defendant.

---

Mark A. Greenman, Esq., Greenman Law Office, 10 5th Street South, Suite 700, Minneapolis, Minnesota 55402, appeared on behalf of the Plaintiff.

Thomas E. Marshall, Esq., Jackson, Lewis, Schnitzler & Krupman, 150 5th Street Towers South, Suite 2800, Minneapolis, Minnesota 55402, appeared on behalf of the Defendant.

---

## Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge on June 15, 2001, pursuant to Defendant's Motion for Summary Judgment. In his Amended Complaint, Plaintiff, a former employee of Defendant, alleges violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*., and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2611, *et seq*., and he asserts the additional state law claim of negligent infliction of emotional distress. Defendant has asserted counterclaims of breach of contract and fraudulent conversion. The current motion is intended to defeat all of Plaintiff's claims on the contention that Plaintiff signed a valid release of such claims upon his separation from Defendant. The parties have agreed to bifurcate the lawsuit so that the validity of the release may be established before addressing the merit of Plaintiff's underlying claims. For the

FILED AUG 07 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD ________
DEPUTY CLERK ________

reasons set forth below, Defendant's motion is granted and Plaintiff's claims are dismissed with prejudice.

## Background

Plaintiff David Kujawski worked for Defendant U.S. Filter Wastewater Group, Inc. ("USF") from December 1997 until June 22, 1999. In November 1998, Kujawski began having eye problems due to a previous injury, prompting him to take a medical leave of absence. He remained on medical leave for six months until he was terminated on June 22, 1999.

While on medical leave, Kujawski applied for and received short-term disability benefits pursuant to USF's disability plan. Kujawski received benefits until April 1999 when they were terminated by USF. Under the company's plan, Kujawski was entitled to benefits until June 4, 1999. Plaintiff represents that the gap in benefit payments was the subject of the August 1999 settlement agreement at issue.

In early 1999, Kujawski retained Elizabeth Lishner, an ERISA attorney located in California. Kujawski hired Lishner for assistance in obtaining disability benefits, having retained her services in 1996 to obtain such benefits relating to his original eye injury. On June 30, 1999, Lishner wrote a letter to USF on Kujawski's behalf, challenging his termination, questioning the sufficiency of his disability benefits, and asserting his entitlement to severance benefits.

Over the next few weeks, Lishner and Elizabeth Olivier, corporate counsel for USF, exchanged telephone calls and correspondence to negotiate a resolution. On July 20, 1999, Olivier offered a severance payment of $5,769.70 and a short-term disability payment of $6,731.31 in exchange for Kujawski's execution of an Agreement and General Release, releasing all claims related to his employment with USF. Olivier memorialized this offer in a letter, dated

July 21, 1999. The standard Agreement and General Release was revised on two occasions to incorporate provisions requested by Lishner, and a final draft was faxed from Olivier to Lishner on August 24, 1999.

The Agreement and General Release state in relevant part:

* * *

2. . . . The parties wish to avoid all proceedings, litigation and controversy arising out of or in any way related to their employment relationship. Accordingly, both USFILTER and EMPLOYEE desire to provide EMPLOYEE with the following described payments (which constitutes the settlement of a disputed amount) in consideration for the releases and other promises made by the parties to this Agreement. The terms of this Agreement shall not affect EMPLOYEE's rights to apply for long-term disability benefits and USFILTER shall reasonably comply with requests for information from CIGNA for the purpose of processing said claim. EMPLOYEE and USFILTER mutually agree to the terms of this Agreement as a full and complete resolution of any and all issues arising out of EMPLOYEE'S employment with USFILTER.

3. . . . USFILTER acknowledges that USFILTER shall not initiate a legal action for payment of any and all balances due for charges incurred by EMPLOYEE on EMPLOYEE's American Express Corporate Credit Card. EMPLOYEE acknowledges that any balances due on his American Express Corporate Credit Card are his responsibility, not USFILTER's, and that any dispute regarding such charges shall be resolved between EMPLOYEE and American Express. Further, USFILTER hereby fully, forever and irrevocably releases and discharges EMPLOYEE from any and all claims related to EMPLOYEE's employment with USFILTER, excepting only claims related to the breach of this Agreement.

4. EMPLOYEE hereby fully, forever and irrevocably releases and discharges USFILTER . . . from any and all claims suits, debts, obligations, damages, expenses (including attorney's fees and costs), promises, rights, demands, actions or causes of action of any nature whatsoever, known or unknown, suspected or unsuspected, in any way arising from or related to EMPLOYEE's employment and/or termination of employment with USFILTER. It is expressly agreed and understood that this is a GENERAL RELEASE of any and all claims (arising on or before the date this Agreement is signed) EMPLOYEE might otherwise assert against USFILTER.

* * *

The Agreement goes on to list specific statutes that the parties expressly agree to be incorporated within the scope of the release. Both the ADA and FMLA are included in the list. In addition, the Agreement contains provisions stating that the Employee has twenty-one days to consider the agreement within which time he could consult with counsel and seven days after signing the agreement during which it could be revoked.

In a letter dated August 26, 1999, Lishner enclosed a copy of the Agreement and Release executed by Kujawski. A copy of the fully executed agreement and a check made payable to Kujawski for $6,623.70 was sent to Lishner on September 16, 1999. Upon Kujawski's request, USF sent a replacement check on September 22, 1999, in the amount of $9,419.68, the full settlement amount without withholding taxes therefrom. Kujawski subsequently endorsed and cashed the settlement check.

During the course of Kujawski's medical leave and the negotiations subsequent to his termination, Kujawski contends to have experienced a resurgence of long-term mental health problems. At that time, he moved from Pennsylvania to Minnesota in order to reside with his mother. Kujawski represents that he has a history of struggling with numerous psychiatric disorders such as bi-polar disorder, depression, anxiety disorder, panic attack, and attention deficit/hyperactivity disorder. The record reflects that in April 1999, for the purpose of extending his receipt of short-term disability benefits, Kujawski submitted medical information to USF from three different physicians who recommended that he not return to work until July or August for reasons such as "bi-polar disorder-mixed state," "stress associated medical

condition," irritable bowel syndrome, "affective disorder," and depression. His benefits were not reinstated.

From August 17, 1999, through September 10, 1999, Kujawski attended an outpatient program at Abbott Northwestern Hospital, Partial Hospitalization Program for Behavioral Services. Upon entering the program, Kujawski was taking various medications, including Prozac, Wellbutrin, Depakote, and Klonopin. At certain times from May 1999 through August 1999, Kujawski was also taking Zyprexa, an anti-psychotic drug, and Buspar, an anti-anxiety medication.

Kujawski contends that, from April 1999 through October 1999, he was unable to conduct his day-to-day affairs, relying on his mother and mental health care providers for assistance. According to her affidavit, Kujawski's mother maintained control over her son's affairs such as the handling of personal correspondence and money management. USF points to several occasions during that time as evidence of Kujawski's competency and ability to negotiate his own affairs: (1) a July 7, 1999, letter and check made payable to USF to pay for his insurance premium; (2) a W-4 form, completed and signed on August 8, 1999; (3) a health insurance continuation form, indicating his choice of coverage and provider and his calculation of amount owed, completed on August 17, 1999; (4) a September 14, 1999, letter to Dave Ward of USF, following up a telephone conversation about the enclosed W-4 form; (5) his assistance to his mother in her preparation of his long-term disability claim; and (6) his occasional reading of the ST. PAUL PIONEER PRESS newspaper.

On October 27, 1999, Kujawski filed a Charge of discrimination against USF with the Equal Employment Opportunity Commission ("EEOC") branch in Pittsburgh, Pennsylvania. The EEOC responded to Kujawski in writing on December 27, 1999, stating that further

investigation of his claims would not likely result in the finding of a violation because he had "knowingly and willingly" signed the agreement and release and had received "the considerations offered by [USF]." On January 31, 2000, Kujawski submitted a one hundred and one-page packet of a letter and exhibits, requesting reconsideration of the EEOC decision. On February 4, 2000, the EEOC issued a Notice of Right to Sue.

In February 2000, Kujawski filed an action in Ramsey County Conciliation Court to enforce the agreement, claiming that USF had not cooperated in the processing of his claim for long-term disability benefits as they had promised. The case was dismissed on June 14, 2000, for lack of jurisdiction. Kujawski commenced the current lawsuit in June 2000, claiming violations of the ADA and FMLA, and a claim of negligent infliction of emotional distress. USF has asserted counterclaims for breach of contract and fraudulent conversion, as well as it seeks attorney's fees and reimbursement for unauthorized charges on Kujawski's corporate credit card and mobile phone.

The parties have agreed to bifurcate the lawsuit so that the validity of the release may be determined before considering the merits of Kujawski's claims. USF contends that the release is valid and therefore bars the claims Kujawski currently seeks to enforce. To the contrary, however, Kujawski maintains that he was not competent to execute the release at the time, thus rendering the release invalid and his current claims viable to pursue.

**Discussion**

**1. Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the

light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" Fed. R. Civ. P. 1. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

**2. Issues**

**a. Validity of Release**

In determining whether a release is valid, a court is guided by basic rules of contract construction. *Lancaster v. Buerkle Buick Honda Co.*, 809 F.2d 539, 541 (8th Cir.), *cert. denied*, 482 U.S. 928, 107 S. Ct. 3212, 96 L. Ed. 2d 699 (1987). While the Eighth Circuit has yet to clearly establish the standard by which releases of claims under the ADA and FMLA should be evaluated, the Court will apply the "knowing and voluntary" standard in light of its use in Title VII cases and by other circuits in ADA and FMLA cases. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 n.15 (1974) (holding that release of Title VII claims should be assessed for whether "knowing and voluntary"); *Rivera-Flores v. Bristol-Myers Squibb Caribbean*, 112 F.3d

9, 12 (1st Cir. 1997) (applying "knowing and voluntary" standard to release of ADA claims); *Bledsoe v. Palm Beach County Soil & Water Conservation Dist.*, 133 F.3d 816, 819 (11th Cir. 1998) (same); *Riddell v. Medical Inter-Ins. Exch.*, 18 F. Supp. 2d 468, 471 (D.N.J. 1998) (applying "knowing and voluntary" standard to release of FMLA claims in light of its application in Title VII and ADEA and the similarities amongst the statutory schemes); *Somora v. Marriott Corp.*, 812 F. Supp. 917, 922-23 (D. Minn. 1993) (citing to Minnesota state cases and discussing application of "knowingly and voluntarily" standard in Title VII cases and MHRA cases based upon similarity of statutes). In their application of the "knowing and voluntary" standard, courts have considered several factors as indications of a valid release of claims: (1) the language of the release; (2) the presence of legal counsel; and (3) the presence of exceptional circumstances, such as fraud, duress, or other inequitable conduct. *Pilon v. Univ. of Minnesota*, 710 F.2d 466, 467-68 (8th Cir. 1983); *Somora*, 812 F. Supp. at 923-24 (quoting *Riley v. American Family Mut. Ins., Co.*, 881 F.2d 368, 371 (7th Cir. 1989); *Sorenson v. Coast-to-Coast Stores (Central Organization), Inc.*, 353 N.W.2d 666, 669-70 (Minn. Ct. App. 1984).

Applying such factors to the relevant facts in this case, the Court finds the release to be valid on its face. First, the language of the release is abundantly clear that by signing the Agreement, Kujawski was releasing any and all claims against USF relating to his employment. The agreement then went on to highlight specific statutes contemplated by the agreement, including the very statutes under which Kujawski brought his claims. Whether reading the Agreement for its general or specific terms, it is clear upon even a cursory reading that the claims Kujawski now raises were intended to be released. Second, not only was Kujawski represented by counsel throughout the process of drafting the Agreement, but Kujawski's attorney successfully negotiated several provisions to his benefit. The correspondence and

communications between counsel for both parties reflect an extensive and thorough process. Moreover, Kujawski has represented that he did communicate with his attorney during the process and especially once a draft agreement was reached and before he signed the document. Whether he fully grasped the legal ramifications of the Agreement is irrelevant for purposes of assessing the validity of the release. *Pilon*, 710 F.2d at 468; *Somora*, 812 F. Supp. at 923-24. The clarity of the contract and the active presence of counsel throughout the negotiating and executing process indicate to the Court that the signed Agreement was a fairly negotiated and executed contract into which Kujawski entered knowingly and voluntarily.

USF would have the Court inquire no further. However, to the extent that the issue of Kujawski's competency can be viewed as an exceptional circumstance rendering the release void, the Court must evaluate the Agreement for the unfairness of which Kujawski complains. To begin with, the Court finds it important to note that Minnesota law and public policy indicates a presumption of mental competency. *See, e.g.,* Minn. Stat. § 253B.01, *et seq*. (1998) (Minnesota Civil Commitment Act indicates presumption of competency by requiring establishment of mental illness for both voluntary and involuntary commitment). Given the unfortunate prevalence of mental health disorders within our country's adult population, but the corresponding success with which many people are able to manage their mental health needs, often with the assistance of medication and/or therapy, it would be a shocking and unwarranted conclusion to presume that mental illness automatically begets incompetency. That being said, the Court is not unmindful of the extreme manifestations of mental illness and its potential effect on a person's ability to manage his/her own affairs.

The law in Minnesota is clear that competency "cannot be changed from a shield of protection to a rapier of offense." *Schultz v. Oldenburg*, 277 N.W. 918, 922 (Minn. 1938). As a

general rule, a party may not assert a defense of incompetency for the purpose of avoiding a contractual obligation if the alleged incompetency lasted only a short amount of time and the party is no longer incompetent. *Id*; *Wood v. Newell*, 182 N.W. 965 (Minn. 1921). Furthermore, "a contract with a person of unsound mind will not be set aside or annulled at his suit where it appears that it was entered into in good faith, for a fair consideration, and without notice to the other party of facts or circumstances sufficient to put a prudent person upon inquiry as to such mental incapacity, and no inequitable advantage has been derived therefrom. *Wood*, 182 N.W. at 966 (citations omitted). The *Wood* court went on to note the party's ratification of the Agreement after recovering from his alleged incompetency. *Id.*

When applying the factors set forth in *Wood* in conjunction with the Court's conclusions outlined above, the Court finds the release to be valid. First, there is no evidence before the Court to indicate that the Agreement was negotiated in bad faith. Second, in light of the apparent mutual release of all claims and the significant provisions negotiated on Kujawski's behalf, *e.g.*, severance and benefits payments and a promise to assist in application for long-term disability benefits, fair consideration and no inequitable advantage is apparent. Third and most significantly, there is insufficient evidence that USF or even Kujawski's own attorney was aware of his alleged incompetency. Kujawski points to his submission of physician's notes for extended short-term benefits as evidence of USF's notice of incompetency. Upon review of his alleged submissions, however, the Court finds that they provide little more to a reader than a list of general diagnoses and recommendations for a leave of absence. It is far from an automatic conclusion that such information would inform its reader that Kujawski was "incompetent," a fact that remains in dispute but need not even be determined to decide this motion. Moreover, as the Court has indicated above, there is a significant presumption of competency under Minnesota

law, and Kujawski, through his attorney, continued to engage in active negotiations with USF even after his attempt to extend payments. In addition to all that has been discussed above, it is clear to the Court that Kujawski ratified the Agreement through his acceptance of the settlement payment and his subsequent attempt to enforce the Agreement with respect to USF's promise to cooperate with his application for long-term disabilities.

In sum, there is absolutely no evidence before the Court to indicate that USF took advantage of Kujawski's mental state nor negotiated otherwise in bad faith to achieve an agreement ultimately unfair to Kujawski. To the contrary, the Court finds that Kujawski received fair consideration and entered into the Agreement knowingly and willingly. Accordingly, the Court finds the release to be valid and Kujawski's claims under the ADA, FMLA, and for the negligent infliction of emotional distress to be legally barred.

**b. Defendant's Requested Relief**

In light of the Court's conclusions outlined above, the Court must also consider USF's request that the Court order payment of attorney's fees and costs. Paragraph eleven of the parties' Agreement states: "EMPLOYEE further agrees that should he unsuccessfully challenge the validity of any portion of this Agreement, he will pay the attorney's fees and costs incurred by USFILTER." At this time the Court lacks sufficient information to determine whether an order on this issue is appropriate. The Court suspects that USF's counterclaims were raised merely to preserve its rights pending the outcome of the current motion and will be dismissed without prejudice forthwith. If this is the case, then the Court will require Defendant to submit proper briefing with any necessary affidavits within two weeks of this decision so that the Court may consider the reasonableness of the request under the circumstances. Plaintiff may submit responsive papers on this issue within one week of receiving Defendant's submissions. If,

however, the Court has misconstrued the situation and/or USF intends to proceed with its counterclaims, then the Court should be so informed by the parties in writing. Accordingly, the Court reserves ruling on whether USF is entitled to its fees and costs under the Agreement given the remaining counterclaims. In addition, the Court declines to issue sanctions under Rule 11 of the Federal Rules of Civil Procedure as USF has requested, having been presented with insufficient evidence of improper purpose or frivolity.

With respect to USF's request that the Court issue an injunction precluding Mr. Kujawski from filing any further lawsuits against USF, the Court declines to do so. The first that the Court had even heard of an interest in such relief was at the hearing held on June 15, 2001. The Court has been presented with no legal authority nor articulated basis to support the imposition of such an extreme remedy. Moreover, the fact that Mr. Kujawski has filed lawsuits in the past and has been unsuccessful in challenging the contract at issue here does not render the pursuit of such actions necessarily frivolous. While the Court certainly encourages citizens to closely evaluate their disputes and legal concerns whether on their own or with the assistance of counsel, the Court cannot and will not preemptively hinder access to its doors based solely on one party's frustration with another's frequent access.

For the reasons stated, **IT IS HEREBY ORDERED** THAT:

1. Defendant's Motion for Summary Judgment (Doc. No. 17) is **GRANTED in part** and **DENIED in part** such that:

a. The August 24, 1999 Agreement between the parties contains a valid release of claims;

b. The Court reserves jurisdiction over the issue of whether to award Defendant's attorney's fees and costs and respectfully requests the parties to proceed consistent with the provisions of this Memorandum Opinion and Order;

c. The Court declines to issue sanctions under Fed. R. Civ. P. 11; and

2. Plaintiff's Amended Complaint is **DISMISSED WITH PREJUDICE.**

Dated: August 7, 2001

DONOVAN W. FRANK
Judge of United States District Court

**Please forward this announcement to the recipient of this fax.**

---

# The United States District Court, District of Minnesota announces two new programs!

**Expedited Trials** –The Court will begin offering parties an opportunity to participate in a program called Expedited Trials beginning July 2, 2001. This voluntary program offers an alternative to traditional case processing by allowing for a shorter time period from filing to disposition. Discovery and motion practice will be sharply limited as a means to reduce time and expense. Procedural rules are on the Court's website at www.mnd.uscourts.gov. If you would like additional information about the Expedited Trials Program, contact one of our clerk's offices at the phone numbers listed below.

**Courtroom Technology – Phase II** – In June 2001, the District of Minnesota began upgrading, installing, and enhancing the technology available to counsel in the courtroom. The project will continue through early fall and will ultimately upgrade all Article III Judge courtrooms in St. Paul and Minneapolis. To assist counsel with this transition, the District Court is offering a hands-on class, worth one hour of CLE credit at both courthouses. Classes will be held over the lunch hour. Course registration can be done by visiting www.mnd.uscourts.gov or by calling Kristine at 612-664-5125.

## For additional information on either program please visit our website at www.mnd.uscourts.gov.

---

700 Federal Building
316 North Robert Street
St. Paul, MN 55101
(651) 848-1100

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5000

417 U. S. Courthouse
515 West First Street
Duluth, MN 55802
(218) 529-3500